GENE DOOLEY and SANDRA K. DOOLEY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent.
Dooley v. Commissioner
Docket No. 23510-81.
United States Tax Court
T.C. Memo 1984-548; 1984 Tax Ct. Memo LEXIS 122; 48 T.C.M. (CCH) 1372; T.C.M. (RIA) 84548; October 15, 1984. *122 Roger K. Fisher, for the petitioner. James T. Million, for the respondent. JACOBS MEMORANDUM FINDINGS OF FACT AND OPINION JACOBS, Judge:* Respondent determined the following deficiencies in, and additions to, petitioners' Federal income taxes: Year
Deficiency
Section6653(a)
1976
$7,443.00
$372.15
1977
$8,745.80
$437.28
1978
$8,805.20
$440.26
After concessions, the sole issue of decision is whether the corporation of which petitioner Gene Dooley is the sole shareholder is to be treated as a separate taxable entity. FINDINGS OF FACT The facts have been fully stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated by this reference. At the time of the filing of the petition herein, petitioners, Gene Dooley (Gene) and Sandra K. Doolely (Sandra), husband and wife, resided in Joplin, Missouri. For the taxable years in issue, Gene and Sandra filed joint income tax returns. Dooley Enterprises, Inc. (Enterprises) was organized *123 under the laws of the State of Missouri on April 1, 1968. At all times thereafter, including the taxable years at issue, it existed as a valid corporation. Its Articles of Incorporation provided, inter alia, that 51 shares of common stock were to be issued prior to the commencement of business for a consideration of $10 per share, or a total of $510 [1], all to Gene. It further provided for a broad authorization of corporate purposes and functions, including the constructing, owning, maintaining, and managing of real estate. At the corporation's organizational and first meeting of shareholders and directors [2], Gene was elected President and Chairman of the Board, Sandra was elected Secretary-Treasurer, as well as a director, and Gene's father, Roy Dooley, was elected Vice President and director. The officers were directed to pay expenses of the organization from corporate funds, to open a checking account at Security National Bank, and to borrow funds to carry on the construction business of the corporation. The minutes of the meeting stated: the Corporation was *124 formed as a construction company only to limit its and its Shareholders [sic] liability in the borrowing of money necessary to complete a 221D3 F.H.A. apartment project in Joplin, Missouri and that all properties acquired in the name of Dooley Enterprises, Incorporated, or to properties in which it will have legal title, will not in fact beneficially belong to Dooley Enterprises, Incorporated, but that said Corporation is to hold legal title thereto in trust and as agent for Gene Dooley. . . . And recognize also, that Dooley Enterprises, Incorporated is under duty to transfer such legal title at such times as said Gene Dooley may direct; and that he [sic] Board of Directors and Officers of said Corporation are authorized . . . to transfer . . . all or any part or parts of the legal title held by Dooley Enterprises, Incorporated to all properties . . . to the person or persons . . . as may be instructed or directed by Gene Dooley, the consideration for such transfer being in fact that such properties . . . do not actually belong to Dooley Enterprises, Incorporated, but are held by it in trust and as agent for Gene Dooley. (emphasis added) *125 On March 6, 1969, Enterprises took title to a parcel of land in Joplin, Missouri, for $26,500 from the Land Clearance for Redevelopment Authority of Joplin, Missouri. Enterprises obtained the property to build a 40-unit low rent subsidized apartment complex (the project). [3] It was intended that the project would qualify for a mortgage insured by the Federal Housing Administration (FHA) under Section 221(d)(3) of the National Housing Act. Enterprises executed a Deed of Trust and a Deed of Trust Note in its own name on March 10, 1969, for permanent financing in the amount of $407,300 from the Metropolitan Life Insurance Company, arranged through the mortgage banking firm of Charles F. Curry Company. The note provided for a 6-3/4% interest rate. The maximum rate of interest chargeable to individuals in Missouri *126 on loans secured by a deed of trust at this time was 8%. On the same date, Enterprises, as the "Housing Owner", entered into a Rent Supplement Contract and an agreement designated as the "Regulatory Agreement for Limited Distribution Mortgagor Projects under Section 221 (d)(3) of the National Housing Act, As Amended", with the FHA. This Rent Supplement Contract provided that the "Housing Owner certifies that it has the legal authority to enter this contract and to own . . . the Project . . . ," and that "the Secretary agrees to make rent supplement payments to the housing owner. . . ." [4]
Also dated March 10, 1969, was a construction contract *127 between Gene Dooley as Contractor and Enterprises as owner, signed by Gene Dooley as president. The contractor and the owner exchanged performance and payment bonds, each in the amount of $35,753.00. A title insurance policy dated March 11, 1969, showed title to the property as being vested in Enterprises in fee simple. At a special meeting of the Board of Directors of Enterprises on January 27, 1970, it was decided that after construction of the project, the property should be transferred to Gene individually, and Enterprises should be dissolved as the "Corporation had served its purpose." Construction was completed shortly before April of that year, but the transfer to Gene was never made and Enteprises were never dissolved. Enterprises, however, notified the State Division of Employment Security, in a form dated April 27, 1970, that its business had been discontinued as of January 15, 1970. It also applied for an exemption from filing employment security contributions and wage reports. A Standard Fire Insurance Policy was renewed for the period January 7, 1972 to January 7, 1973, showing the insured to be "Gene Dooley and/or Dooley Enterprises, Inc." On or *128 about June 7, 1972, Gene opened an account at the First National Bank & Trust Company of Joplin, in the name of "Gene Dooley 221D3 Rent Supplement." In connection therewith, he executed an "Authority of Proprietorship" which stated that "the Gene Dooley Rent Supplement which is engaged in the Apartment Rentals [sic] at Joplin, Mo., is not incorporated, nor is it a partnership but is a proprietorship owned exclusively and entirely by the undersigned . . . /s/ Gene Dooley." Either Gene or Sandra individually were empowered to endorse checks to this account. All project rentals were deposited in this account including the monthly rent supplements from the FHA, and all project expenses were paid out of this account. The project made, at all times relevant, a monthly request to the FHA for the rent supplement in the name of Enterprises. Enterprises maintained a savings account at the First State Bank of Joplin, Missouri, from October 25, 1973, to May 19, 1976. Gene and Sandra were the authorized signatories. The money in this account consisted of security deposits of tenants of the project. The funds in this account were transferred to a savings account at the First National *129 Bank of Joplin in the name of Dooley Rent Supplement. On November 22, 1976 Enterprises, as "Housing Owner", entered into an amended rent supplement contract with the FHA. Invoices and statements for various dates in 1976 and 1977 were made out to "Dooley Enterprises" for work performed (e.g., appliance and plumbing repair), services rendered (water service), and county taxes. There were also statements during these years from the "Dooley Investment Company, Inc." on Gene's individual stationery reflecting charges to Enterprises for photocopies. All invoices and bills were paid by check from the Gene Dooley 221(D)3 Rent Supplement account. An agreement dated January 1, 1977, between "Gene/Sandra Dooley, Dooley Investment Company, FWD Enterprises, Dooley Enterprises, Inc. Party(s) [sic] of the First Part, and James T. Dooley Party of the Second Part" purports to establish an independent contractor relationship "absolutely excluding any employee-employer style relationship" (original emphasis). This contract required James, the son of Gene and Sandra, to do "office, maintenance, yard and repair work for apartments and insurance offices, as required and requested" *130 in return for compensation "as determined by services performed and agreed on in advance and as negotiated from time to time." In a letter dated September 20, 1978, in response to a request by Gene for a rent supplement increase, the Chief of the Loan Management Branch of the relevant office at the FHA referred to Dooley Enterprises. As a condition of obtaining approval for the rent increase, a Rental Schedule had to be completed and returned to the FHA. In transmitting the requisite form, Gene used his individual stationery. The form, which was completed by Gene on September 25, 1978, showed the project owner (mortgagor) as "Dooley Enterprises, Inc.", the project name as "Gene Dooley Rent Supplement", and the name and title of the correspondent as "Gene Dooley, President, Dooley Enterprises, Inc." In the space provided for the list of "principals comprising the mortgagor entity" the instructions for completion direct that if the principal is a corporation, all officers, directors, and major stockholders be listed. It also directs that the name of the corporate resident agent, if any, be listed. The listing supplied by Gene only shows "Gene Dooley, President" and "Sandra K. *131 Dooley, Secretary-Trasurer." This form was signed "Gene Dooley, Pres." No corporate resident agent was listed. A Statement of Loan Account from Charles F. Curry Company covering the period January 16, 1978, to September 22, 1978, was addressed to "Dooley Enterprises." A sign labeled "Dooley Enterprises, Inc." was posted on the exterior of one of the rental project buildings and remained there during the taxable years in issue. Of the 40 original leases, records were available for only 15, the remaining 25 having fallen to the rental project's practice of destroying the records after a tenant moved or died. Only one of the 15 extant leases show Enterprises as the landlord; 14 show Gene Dooley as the landlord. Of these 14 tenants, all made checks payable to "Gene Dooley Rent Supplement 221D3." Evidence was not submitted to determine who was shown as landlord on the 25 destroyed leases or to whom they paid their rent. For all taxable years subsequent to the taxable year ending March 31, 1970, Enterprises filed corporate income tax returns, in which it stated that there had been "no receipts or disbursements" for the subject year and that "Dooley Enterprises, Inc. was *132 incorporated for the purpose of holding title to a low income housing complex as trustee and to serve as a nominee corporation for the benefits of Gene Dooley, an individual." Respondent contends that the existence of Enterprises as a separate and viable tax entity must be respected; petitioners argue otherwise. In the Notice of Deficiency, respondent claimed that $8,998.00 for 1976, $8,998.00 for 1977, and $8,491.40 for 1978 should be added to petitioners' income as compensation from Enterprises to Gene as a management fee. [5] This was based on monthly disbursements of $691.50 from the rental project to Gene for all of 1976 and 1977 and the first nine months of 1978. The disbursements were based upon gross income of the project, and increased slightly following September, 1978, that being the first year in which the project realized a net income. The financial records of the project did not reflect these disbursements in net income or loss at year end as a book entry was made to add these amounts back to income. Petitioners contend that the transfer of the funds from Enterprises to Gene are nontaxable transfers of funds from a sole proprietorship to its owner. *133 Respondent also omitted, in computing petitioners' income tax, the income or loss resulting from the net operating profit or losses of Enterprises. Alleging that Enterprises is the party which must report these items, respondent contends that Enterprises' $648.30 net loss in 1976, and its $2,550.41 net loss in 1977 are not available for use by petitioners, and its $2,797.08 net income in 1978 is not to be included in petitioners' 1978 income thus resulting in corresponding increases in 1976 and 1977 and a decrease in 1978 to petitioners' income. OPINION Petitioners contend the Enterprises did not engage in sufficient business activities to be considered a separate taxable entity and that it merely held title to property as the agent of the petitioners. Hence, they argue that the payments Gene received from the project are not taxable as remuneration from a corporate entity (but rather are nontaxable transfers of funds from a sole proprietorship to its owner) and that the losses of the project can be utilized by petitioners. It is a well settled principle of tax law that *134 a corporation, unless formed as a tax avoidance device, will be respected as a separate entity. In , (1943), the Supreme Court recognized the separate tax identity of a corporation, and in so doing enunciated the following principle: The doctrine of corporate entity fills a useful purpose in business life. Whether the purpose be to gain an advantage under the law of the state of incorporation or to avoid or to comply with the demands of creditors or to serve the creator's personal or undisclosed convenience, so long as that purpose is the equivalent of business activity or is followed by the carrying on of business by the corporation, the corporation remains a separate taxable entity. [, fn. refs. omitted.] This court and others have had ample opportunity to examine the parameters of the principle that a corporation's separate tax identity will not be disregarded if the corporation either served an intended business function or actually engaged in business and have drawn such boundaries narrowly. In fact, it is rare that a corporation's tax identity (short of an *135 absolute sham) will be ignored. [6]
*136 The principle set forth in Moline Properties directs us to determine first whether the creator has secured for himself, by using a corporate entity, a business advantage not available absent the corporation (so that, e.g., the incorporation itself can be viewed as a business activity), and second, whether the corporation engaged in business activities subsequent to formation. This is a disjunctive inquiry. . If either prong of the two-pronged inquiry is satisfied, the corporation's tax existence is established. This court and others have found the creator's purpose equivalent to business activity where the corporation was used to insulate the creator from personal liability, ; ; cf. , affg. ; where the corporation was used to obtain financing at rates that would have *137 been usurious if made to the creator as an individual or partnership, , affd in a unpublished opinion, ; ; , affd per curiam ; , affg. a Memorandum Opinion of this Court; ; where the corporation was used to facilitate the orderly liquidation of a bankrupt estate, ; and where United States citizens used a corporation to engage in a farming business in Mexico when they would not have been able to do so without the corporation, , cert. denied, . The second prong of the Moline Properties *138 analysis requires an inquiry as to whether the corporation engaged in a substantial business activity. This does not depend on the quantum of business activity but simply on whether any activity is related to the transaction of business. . A corporation which is formed to hold title to property may engage in transactions essential to the holding and transferring of title and yet still be ignored for tax purposes, ; but once it engages in a substantial business activity, its separate tax existence is indelibly established. Hence, in Raffety Farms, Inc. (where the corporation signed leases, received and paid out funds, contracted for loans, goods and services, and defended a suit brought against it) and in , affg. per curiam a Memorandum Opinion of this Court (where the corporation contracted in its own name, and maintained a bank account through which receipts and expenditures flowed), the corporations were recognized as taxable entities since they engaged in substantial *139 business activities. See also , cert. denied ; , cert. denied ; ;It is inconsequential to this inquiry that the corporations ignored all formalities, had no physical offices, or that the shareholders performed many of the major transactions. For instance, in , this court found that the corporation existed despite the fact that the partnership which formed the corporation secured the permanent loan commitment, guaranteed the permanent loan, engaged the construction contractor, entered into the leases as lessor, took all receipts directly, operated the business (paid, hired and fired employees, and made arrangements with the utility companies), and defended suits, all in its own name. The corporation complied with no corporate formalities, kept no books, had no employees of its own (all the employees being that of the *140 partnership), had no assets other than the subject parcel, and, in corporate income tax forms, showed no income and designated its activity as a "nominee corporation". We concluded, however, that the second prong of the Moline Properties test was satisfied given that the corporation was designated in the mortgage agreement as bona fide and as the true owner of the property, that it secured insurance, that it executed loans even though guaranteed by an individual partner in the shareholder/partnership, and that it had a checking account through which the loan funds passed. We stated: "If the corporation was intended to, or did, in fact, act in its own name with respect to property, its ownership thereof will not be disregarded." . Courts that have held that the corporation may be ignored generally proceed along the lines of sham or tax avoidance. In both , affd per curiam , and , *141 the Commissioner prevailed in his contention that the corporation did not exist as a bona fide entity. In each case, the corporation was found to have no substantial business function other than tax avoidance. A clear illustration of the boundary that must be observed is in , where two corporations (Raymep and Westrich) were formed by a partnership to hold real estate. Neither corporation observed any corporate formalities or kept an office or bank account, and neither had income. The partnership collected all rents and paid all expenses, and the leases showed the partnership as lessor. The only difference between the two corporations was that Raymep took out a $50,000 loan. The court found that this alone was enough of a business activity for tax purposes to endow Raymep with corporate status while Westrich retained its nominee status. Applying the Moline Properties analysis to the facts in the instant case requires the recognition of Enterprises' tax existence. As stated previously, the first prong of the inquiry requires an examination of the purpose for which the corporation was formed. *142 Here, Gene's express purpose in forming Enterprises was to shield himself from personal liability. This is an advantage under Missouri law that he would not otherwise have enjoyed without the intervention of the corporate form and is thus the equivalent of business activity. Of course, constructing, holding and owning the project through Enterprises provided Gene with the benefit of limited liability regardless of his express purpose since every corporation formed in Missouri shields the shareholders thereof from liability. It is not simply the intention with which the taxpayer begins when he creates the corporation, but also the advantages that naturally result from use of the corporation to transact his business that is subject to our inquiry. In 1970, it was decided that Enterprises would dissolve following the construction and conveyance of the project to Gene. Had this occurred, there would be no dispute. However, the project was never conveyed to Gene nor was Enterprises dissolved because, as stated by petitioners in their brief, "it would have defeated the purpose of the corporation as the legal title holder to the property on behalf of Mr. Dooley." Enterprises was involved *143 in transactions at least through 1978. Enterprises never ceased functioning; it continued to be used by Gene to shield himself from personal liability. Therefore, the purpose for which Gene used Enterprises in the years at issue can still be characterized as the equivalent of business activity. The second prong of the Moline Properties inquiry requires an examination of the activities of the corporation to determine if any can be characterized as the "carrying on of business by the corporation." Here, Enterprises was given broad corporate powers in its Articles of Incorporation. In the years prior to those at issue, it executed a construction mortgage, as well as a deed of trust and note for a permanent loan, entered into contracts with the FHA for Rent Supplements and Mortgage Insurance and a contract with Gene as general contractor, maintained a bank account, and executed at least one lease as lessor. Enterprises continued to engage in similar activities during each of the taxable years before us. In 1976, Enterprises entered into a new contract with the FHA, by Gene Dooley as president, and filed monthly rent requests to the same federal agency. During 1976 *144 and 1977, Enterprises was billed for goods and services provided it, including services from Dooley Investment Co. It entered into a contract with James Dooley purportedly as an independent contractor. In 1978, Enterprises had further correspondence with the FHA, this time requesting rent supplement increases in a form signed by Gene as president. These activities constituted business transactions by Enterprises in its own name. We need not decide which individual items are substantial business activities; taken together, the corporation's acts point overwhelmingly to the conclusion that, at all relevant times, Enterprises was a functioning corporation that must be recognized as a separate taxable entity. As was the case in Moline Properties, a taxpayer who chooses to accept the advantages of operating through a corporation cannot, at his convenience, choose to ignore consequent tax disadvantages. Having found Enterprises to be an existing corporation, it might yet be found that Enterprises is the agent or nominee of Gene. [7] As such, the project would be considered as operated by Enterprises on Gene's behalf. *145 In such a situation, the income and loss would flow to Gene via the corporation, rather, than to Enterprises itself. Also, the management fee to Gene would not be remuneration from Enterprises but instead would be a nontaxable transfer of funds from the project to Gene, in which Enterprises merely acted as a conduit. The usual indicia of the agency relationship were outlined in . *146 In that case, after holding that the corporation involved therein was not an agent of its shareholder, the Court stated: What we have said does not foreclose a true corporate agent or trustee from handling the property and income of its owner-principal without being taxable therefor. Whether the corporation operates in the name and for the account of the principal, binds the principal by its actions, transmits money received to the principal, and whether receipt of income is attributable to the services of employees of the principal and to assets belonging to the principal are some of the relevant considerations in determining whether a true agency exists. If the corporation is a true agent, its relations with its principal must not be dependent upon the fact that it is owned by the principal, if such is the case. Its business purpose must be the carrying on of the normal duties of an agent. [336 U.S. at 437, fn. refs. omitted.] In addressing the application of this principle, we recently stated that, "[t]he Supreme Court did not intend to create a 'factor checklist' *147 to be mechanically applied to the facts of each case. . . The one crucial question under National Carbide concerns the essential nature of the relationship between the purported corporate agent and it shareholders. ." . A wholly owned corporation is, in many ways, indistinguishable from an agent for its sole shareholder. Whether as an independent corporation or as a true agent, each in reality (ignoring legal fictions) performs the business of, and is controlled by, the shareholder.But the distinguishing characteristic is the manner in which this function is performed. The corporation performs this function as if it owned the property and the business in which it is involved, retaining full liability for its actions. The agent on the other hand, presents itself as a representative of another as it transacts that other party's business, such that this other party is at risk for the acts of the agent. Enterprises entered business transactions as the true party in interest. It never held itself out *148 as an agent of Gene. An agency of the federal government, the State of Missouri, insurance companies, suppliers, banks, and the general public all dealt with Enterprises as the owner of the project, never relying on any other as the principal party. Enterprises (and not Gene) retained full liability for its actions. Indeed, in view of Gene's desire to insulate himself from liability, any use of Enterprises as an agent would have been self-defeating. The income derived by Enterprises is principally attributable to the project itself, which was owned by Enterprises rather than by Gene. The record shows a Rent Supplement Contract between Enterprises (designated the "housing owner") and the FHA pursuant to which Enterprises certified that it has the legal authority to own the project. That the minutes of the organizational meeting of Enterprises states that the properties were held as agent for Gene does not persuade us that an agency relationship between Enterprises and Gene truly existed. It is not enough that the parties purport to enter an agency relationship; they must perform accordingly, which was not the case here. Nor are we swayed simply by the fact that the *149 rent was deposited in a noncorporate account. Viewed in its entirety the essential nature of this relationship is clearly that of corporation/shareholder, rather than agent/principal. On the basis of our findings that Enterprises was, at all relevant times, a viable independent corporation and not Gene's agent, we hold that Enterprises is a separate taxable entity. As a result, Gene may not claim any of its net losses or income and he must include in his income all sums paid to him as a management fee. Accordingly, Decision will be entered under Rule 155.
Footnotes
*. By order of the Chief Judge, this case was reassigned from Judge Darrell D. Wiles to Judge Julian I. Jacobs for disposition.↩
1. The minimum capitalization required to form a valid corporation in Missouri is $500.00.↩
2. The organizational meeting allegedly was held on March 22, 1968, which was the same date that Gene Dooley signed the Articles of Incorporation. The Articles of Incorporation for Enterprises, however, were not accepted for record until April 1, 1968.↩
3. An Application for Project Mortgage Insurance (an FHA form) showed the project name as "Rent Supplement, 24th & Moffet, Joplin, Missouri" and was signed by Gene Dooley as "Sponsor", dated July 5, 1968. A Rental Housing Project Income Analysis and Appraisal, completed in October, 1968 by the FHA showed the project name as "Gene Dooley Rent Supplement."↩
4. The record does not establish that petitioners were required to use a corporation in order to become a party to this contract. In forms appended to the Rent Supplement Contract, designated as a "Contractor's Requisition" and a "Contractors and/or Mortgagors Cost Breakdown", Gene was shown as both the "owner" and the "sponsor". On both forms, the project is referred to as the "Gene Dooley Rent Supplement." The former form is not signed, but the latter is signed by "Gene Dooley" in the spaces designated "Contractor" and "Mortgagor".↩
5. The parties stipulated that $700 of these amounts for 1976 and 1977 each constitutes income taxable to petitioners as wages received by Sandra.↩
6. , affg. ; ; , affg. a Memorandum Opinion of this Court; , affd. in an unpublished opinion ; , cert. denied ; ; , cert. denied ; ; ; ; . On the other hand, the Commissioner is given greater latitude than the taxpayer to disregard the creature conceived by the taxpayer, see and cases cited therein; , affd per curiam ; ; although such is by no means easy even for him, ; ; ; ; ; . See also the cases collected and the "statistical" breakdown in S. Kronovet "Straw Corporations: When Will They Be Recognized; What Can and Should Be Done." .↩
7. Petitioner made an oblique reference to this theory in his petition by stating that the net income and loss were in fact his and not that of Enterprises. Yet he failed to argue this on brief, arguing only that Enterprises did not exist. However, respondent insists in his reply brief that "petitioners consistent with their petition, are primarily arguing that while the corporation was a viable entity, it was acting as Gene Dooley's nominee or agent." We therefore deem this issue as properly placed before us. It has been recognized by this Court that arguments regarding nonexistence and agency are inherently inconsistent. , revd. .↩